SPRING INDUSTRIES, INC. *v.* OHIO
DEPARTMENT OF TRANSPORTATION.

(No. 87-12871—Decided
June 14, 1989.)

Court of Claims of Ohio.

*Larry A. Zink,* for plaintiff.
*Anthony J. Celebrezze, Jr.,* attorney general, and *Susan M. Sullivan,* for defendant.

SHOEMAKER, J. On December 30, 1987, plaintiff, Spring Industries, Inc., filed this action against defendant, the Ohio Department of Transportation ("defendant" or "ODOT"). This action is one of three cases between the parties which were consolidated for trial. For identification purposes this action shall be known as the "Flagpersons" case.

Plaintiff alleges defendant failed to meet its obligation arising from a contractual relationship entered into by the parties on or about February 21, 1986, known as Project No. 106-86 ("project"). Plaintiff also alleges defendant has been unjustly enriched because plaintiff provided defendant with labor and materials for the project and defendant has benefited from said performance without payment therefor.

This cause came on for trial on January 17, 1989. The court has considered the evidence and arguments presented by counsel and renders the following decision.

Findings of Fact

Plaintiff was a contractor in the business of constructing, manufacturing, hauling and placing of highway materials at the time of the incident in question, and defendant was the agency for the state of Ohio responsible for the maintenance and construction of the state's highway transportation system at the time of the incident in question. On or about February 21, 1986, plaintiff contracted with defendant for a roadway paving job as part of the project. This controversy involves the roadway resurfacing of sections of State Route 39, a two-lane secondary roadway in Holmes County, Ohio.

The parties agree that the Agreement, Proposal and Contract Bond ("agreement"), the State of Ohio Department of Transportation Construction and Material Specification Manual ("manual") dated January 1, 1985, and the project plan, particularly page thirteen pertaining to traffic control ("traffic control plan"), are essential components of the contract for the project.

Plaintiff was responsible for traffic control of the construction zone while it was performing the pavement work. Traffic control guidelines were established by defendant to ensure public safety while the roadway was under construction, and plaintiff was re-

quired to adhere to traffic control guidelines established by the traffic control plan while performing the pavement work. The traffic control plan provided a diagram for the placement of traffic control devices within the construction zone, including the placement of two flagpersons. Flagpersons were placed at strategic locations within the construction zone and were under the control and direction of plaintiff. Flagpersons are responsible for the management of traffic flow within a construction zone.

General Note No. 7 of the traffic control plan states that "[f]lagmen shall be used to control traffic continuously for as long as one lane operation is in effect" and "within the length of closure, provision shall be made to control traffic entering from intersecting streets and major driveways as necessary to prevent wrong-way movements and to keep vehicles off of new pavement not ready for traffic."

At all times on said project plaintiff provided at least two designated flagpersons on the roadway paving job. Plaintiff also utilized other laborers to assist in traffic control by acting as flagpersons when not performing labor duties and specifically instructed one laborer to act as a flagperson when not performing labor duties.

Section 105.09 of the manual provides the defendant's project engineer with the authority to suspend any work that is improperly performed. In the early morning of August 6, 1986, plaintiff began working on State Route 39 with three flagpersons on the job. The hours of 7:00 a.m. through 11:00 a.m. and 3:00 p.m. through 5:00 p.m. were the periods of the day involving the most traffic. At approximately midday the third flagperson was removed from the job. Soon thereafter, defendant's project supervisor,

Larry Arnold, telephoned his supervisor, Robert Giauque, ODOT's District Construction Engineer, and informed him that plaintiff could not maintain traffic control with two flagpersons. Giauque told Arnold that he was to shut down the project if traffic control was not maintained. Accordingly, plaintiff was informed that it would have to discontinue work on the project if the third flagperson was not returned to the construction zone. Plaintiff did not perceive any traffic problems due to its actions and, therefore, continued paving, and proceeded with two flagpersons on the job. Defendant again opposed said action.

Later that afternoon, an employee of defendant, pursuant to Larry Arnold's directive, placed a truck in front of plaintiff's pavement equipment, thus physically preventing plaintiff from proceeding with the project. Sometime later, defendant removed the vehicle from blocking the plaintiff's pavement equipment; however, it is unclear how long defendant prevented plaintiff's pavement work.

Plaintiff's president, Glenn Straub, and defendant's agent, Robert Giauque, had a final discussion at approximately 2:00 p.m. on said day concerning the dispute. As a result of their discussion and because defendant's truck was preventing any further paving progress, plaintiff agreed to stop working on the project.

The pertinent asphalt production plant was informed by plaintiff to shut down the production of asphalt material immediately. The asphalt plant was approximately twenty miles from the project site. At that time, however, there were four truckloads of asphalt en route to the project site. Plaintiff's trucks had been delivering asphalt to the jobsite continuously throughout the day at five-to-twelve-minute intervals. Asphalt paving

8

material is extremely hot (over three hundred degrees) and must be removed from the truck to prevent damaging it.

Defendant departed the project site at approximately 2:30 p.m. Within one hour after defendant's departure, plaintiff dumped and placed on the job site the aforementioned four truckloads (fifty-seven cubic yards) of asphalt.

The four truckloads of asphalt placed on the roadway have performed to the satisfaction of the defendant. However, plaintiff has not been paid for the work involved in the placement of the four truckloads of asphalt material and, as a result, plaintiff has not been reimbursed for expenses equal to $3,800.

Finally, no accidents or traffic problems occurred in the area on the day of the incident.

## Conclusions of Law

As aforementioned, the traffic control plan was an essential element of the agreement between plaintiff and defendant and the terms in said plan pertain to the issue at bar. The terms of the plan should be interpreted in observance of their plain meaning.

"Contracts are to be construed according to the sense and meaning of the terms which the parties have used. Words in a written contract are to be interpreted according to their common, ordinary, and usual meaning. It has been said the grammatical and ordinary sense of words and phrases used in a contract must be followed unless it would lead to manifest absurdity, repugnance, or inconsistency. * * *" (Footnotes omitted.) 18 Ohio Jurisprudence 3d (1980) 24-25, Contracts, Section 141.

Defendant contends that the utilization of three flagpersons was necessary to continue paving the roadway because of alleged heavy, congested side traffic and tourist traffic within the construction zone. Defendant cites to General Note No. 7 of the traffic control plan in support of its position. Note No. 7 states that "provision shall be made to control traffic entering from intersecting streets and major driveways as necessary to prevent wrong-way movements and to keep vehicles off of new pavement not ready for traffic." Defendant argues plaintiff's failure to control side traffic mandated the use of three flagpersons and a failure to so conform provided defendant with the opportunity to suspend work on the project.

In the instant case, the traffic control plan diagram expressly provides for the placement of two flagpersons in the construction zone. The parties agreed that only in heavy or congested traffic areas were three flagpersons required. In addition, expert testimony at trial revealed that the regular and ordinary number of flagpersons on a roadway paving job was two. Plaintiff's project supervisor, Robert Warner, with twenty-nine years of roadway construction experience, stated that more than two flagpersons are used only on roadway paving jobs which involve heavy and/or congested traffic areas.

Evidence at trial also indicated plaintiff was in control of the side traffic with two designated flagpersons and as many as three other laborers assisting in traffic control at all times during the incident in question.

Defendant provided insufficient evidence to demonstrate that complaints or accidents were a ramification of plaintiff's actions. Also, the testimony offered at trial did not reveal that the traffic in the area was heavy or congested at the time of the incident.

In view of the above, the court finds that plaintiff has shown by a preponderance of the evidence that its actions were in accord with the plain

and clear terms of the contract by providing, at all times during said incident, two flagpersons and three flagpersons when the conditions necessitated additional manpower. Accordingly, the court further finds that defendant's demand of plaintiff to maintain three flagpersons at the job site at the time in question was unwarranted and unnecessary under the circumstances.

The succeeding issue is whether defendant has been unjustly enriched by the satisfactory performance of plaintiff. In this regard, plaintiff alleges defendant has been unjustly enriched because it provided material and labor for the project without payment. It has been held that unjust enrichment occurs when a party has and retains money or benefits which in justice and equity belong to another. *Hummel* v. *Hummel* (1938), 133 Ohio St. 520, 525-528, 11 O.O. 221, 223-224, 14 N.E. 2d 923, 925-927; *McClanahan* v. *McClanahan* (1946), 79 Ohio App. 231, 233-234, 34 O.O. 549, 550, 72 N.E. 2d 798, 800.

The parties agree that the fifty-seven cubic yards of material placed on the roadway by the plaintiff has performed adequately. As aforementioned, plaintiff was not compensated for this portion of the roadway work. Defendant contends payment is unwarranted because plaintiff placed the material on the roadway without defendant's authority. Defendant relies on Section 105.09 of the manual in support of its authority to suspend the project on the day in question. Section 105.09 states that the project engineer had the authority to reject defective material and to suspend work that is being improperly performed. Plaintiff argues that defendant was unreasonable in its request to supply an additional third flagperson when the situation deemed it to be unnecessary, that the four truckloads of asphalt material have performed to the satisfaction of the parties and that, therefore, defendant had retained a benefit without duly paying for the work.

The evidence reveals that plaintiff shut down the asphalt operation once a final decision to stop the project was rendered. However, the evidence also indicates plaintiff expressly informed defendant of the forthcoming material prior to defendant's departure. The asphalt had been delivered throughout the day on the job site at approximately five-to-twelve-minute intervals. In view of the above evidence, it is the opinion of this court that defendant knew or should have known of the forthcoming deliveries. The court, therefore, finds that plaintiff's action of placing the asphalt, despite the lack of presence and approval by defendant, was justified. The court finds that the defendant's demands were unreasonable and that defendant acted inappropriately by not compensating plaintiff for its work.

The plaintiff has shown by a preponderance of the evidence that defendant has benefited from plaintiff's performance in paving said roadway and as a result has been unjustly enriched due to the lack of payment. Plaintiff's placing of asphalt, subsequent to defendant's departure, was reasonable in light of the circumstances.

In summary, the court finds defendant had the authority to suspend operation of this project although the court does not believe that defendant's demand for an additional flagperson was warranted. However, the court finds that plaintiff's actions were reasonable and appropriate under the circumstances and substantially complied with the terms of the contract. Plaintiff would have suffered damages by dumping the fifty-seven cubic yards

of asphalt in an area away from the job site, and a cause of action may have arisen due to such an event without defendant getting any benefit whatsoever. In the case at bar, however, plaintiff acted responsibly and performed the roadwork to defendant's satisfaction without wasting the asphalt material. Plaintiff should be compensated for such work.

Therefore, the court concludes plaintiff has demonstrated by a preponderance of the evidence defendant's actions were contrary to the contract and thus is entitled to the agreed-upon compensation for said work. Accordingly, judgment is rendered for the plaintiff in the amount of $3,800 plus interest.

*Judgment for plaintiff.*

FRED J. SHOEMAKER, J., retired, of the Court of Common Pleas of Franklin County, sitting by assignment.