**Hempy v. Green**
*[Cite as 3 AOA 301]*

*Case No. 89AP-1369*
*Franklin County, (9th)*
*Decided May 31, 1990*

Crabbe, Brown, Jones, Potts & Schmidt, and Mr. James A. Meaney, for Appellee.

Mr. David P. Reiser, for Appellant.

McCORMAC, J.

Defendant-appellant, James D. Green, and plaintiff-appellee, Nancy Hempy, were co-workers at the Anheuser-Busch brewery for a number of years prior to the summer of 1983. It appears that appellant and his wife were experiencing marital problems and appellant asked appellee if she would go out with him after work one evening. Appellee accepted, fully aware that appellant was married and had children. The relationship blossomed, culminating in a proposal of marriage around Labor Day 1983, contingent upon appellant obtaining a divorce.

In October, appellant informed his wife that he wanted a divorce. As part of the terms they discussed to end their marriage, appellant's wife requested $6,000 in cash along with other considerations. At the time, appellant did not have the cash necessary to meet his wife's demands and approached appellee with his dilemma. After several weeks of deliberation, appellee borrowed money from her credit union, withdrew savings and wrote a check to appellant for $5,800 in January 1984. Appellant, in turn, gave $6,000 to his wife and they were later divorced.

After the divorce was finalized, appellant continued to live with his now ex-wife. He cited concern for his son's well-being and how his children would be affected by his wife's unsuccessful attempt at suicide prior to the finalization of the divorce as his reasons. Appellant broke off his engagement to appellee out of concern for his children. Sometime thereafter, appellee demanded the return of her money. When payments were not forthcoming, appellee obtained counsel and instituted this action.

The case was initially filed in the Franklin County Municipal Court, but after appellant filed a counterclaim in excess of the municipal court's jurisdictional limits, it was transferred to the court of common pleas. Pursuant to Civ. R. 53, the matter was referred to a referee who, after conducting an evidentiary hearing, left the employment of the court without rendering a report and recommendation. A second referee assumed responsibility for the file and rendered findings of fact and conclusions of law based upon a reading of the file and transcript of proceedings. No objections were filed by either party and the trial court adopted the referee's report and entered judgment for appellee.

Appellant appeals and raises the following assignments of error:

"1. THE MUNICIPAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT UPON PLAINTIFF'S COMPLAINT.

"2. THE JUDGMENT OF THE COURT OF COMMON PLEAS IS CONTRARY TO LAW.

"3. THE TRIAL COURT ERRED IN ADOPTING THE REPORT AND RECOMMENDATION OF A REFEREE WHO HAD NOT PRESIDED OVER THE TRIAL OF THE CASE AND HAD NOT SEEN AND HEARD THE WITNESSES."

Appellant's third assignment of error involves a procedural matter which will be addressed prior to reaching the merits of his appeal. The issue presented is whether a successor-referee, who is not present for the evidentiary hearing, may render a report and recommendation based upon his review of the file and transcript of proceedings.

A referee's report submitted pursuant to Civ. R. 53 is merely a recommendation and does not become a final judgment until after the court has reviewed the report, along with any objection filed by the parties, and reached its own independent conclusion. *Ivywood Apts.* v. *Bennett* (1976), 51 Ohio App. 2d 209. For this reason, it is incumbent upon the party claiming error to file objections to the referee's report within the time prescribed by Civ. R. 53(E). The referee's recommendation is not binding upon the trial court. Therefore, if a party does not bring complaints to the court's attention, the court may presume procedural regularity. By not filing objections, appellant has effectively waived his right to complain of the handling of his case at the referee level.

Appellant supports his argument by citing *Welsh* v. *Brown-Graves Lumber Co.* (1978), 58 Ohio App. 2d 49, for the proposition that a succes-

sor-trial judge errs by rendering final judgment based upon a transcript alone when the credibility of witnesses is at issue. In *Welsh*, the court found that, if credibility was an issue, a new trial was mandated but, if credibility was not an issue, then the procedures followed were proper. To come within the scope of *Welsh*, it is necessary for appellant to point out specific instances where credibility was put into issue. Appellant has failed to do so and, without a transcript, this court is unable to search for instances which would lend credence to appellant's argument. Furthermore, it appears that the facts of this action are largely undisputed. This conclusion is buttressed by the failure of any party to object to the referee's findings of fact, which itself precludes assigning as error the trial court's adoption of the referee's findings of fact. Civ. R. 53(E)(6). Therefore, the facts as found by the referee and trial court are not in dispute in this appeal which forecloses any issue of credibility and makes appellant's reliance on *Welsh* unfounded.

Appellant's third assignment of error is overruled.

By this second assignment of error, appellant contends that the trial court's judgment was contrary to law. Appellant argues that the contract between appellant and appellee was void as a matter of public policy because it was a contract in derogation of marriage. Appellee counters by pointing out that the trial court found no contract but rendered judgment on the equitable theory of unjust enrichment. Continuing, appellee claims that since no contract was found appellant's argument must fail. It is this court's conclusion that, under either a legal or equitable theory, appellant's assignment of error should be sustained.

The referee's report supports appellee's contention that the trial court entered judgment on a theory of unjust enrichment. Unjust enrichment is an equitable doctrine which prohibits a party from retaining a benefit at the expense of another when retention would be unjust. *McClanahan* v. *McClanahan* (1946), 79 Ohio App. 231. The equally applicable equitable doctrine of "unclean hands" has been advanced by appellant to counter appellee's argument. As the Supreme Court has stated:

"* * * 'He who comes into equity must come with clean hands,' requires only that the plaintiff must not be guilty of reprehensible conduct with respect to the subject-matter of his suit." *Kinner* v. *The Lake Shore & Michigan Southern Ry. Co.*

(1904), 69 Ohio St. 339, paragraph one of the syllabus, cited with approval in *Goldberger* v. *Bexley Properties* (1983), 5 Ohio, St. 3d 82.

In the present action, both parties are guilty of reprehensible conduct which precludes appellee from claiming clean hands. Throughout the entire course of her relationship with appellant, appellee knew that appellant was married and had children. Even with this knowledge, appellee continued to engage in her affair which she knew would be disruptive of an existing marriage. Eventually, appellee accepted a proposal of marriage from a man who was already married and facilitated the breakup of his existing marriage by providing the money necessary for him to obtain a divorce. There has been no showing that appellee was fraudulently coerced into giving appellant the money. Had this been the case, the situation would be different. Appellee was equally guilty of violating the bonds of marriage and, as such, does not come to equity with clean hands. Equity is based upon what is perceived as just under the circumstances of each case and, when both parties are guilty of injustice, a court of equity will leave them as they are.

While in recent years courts have been less inclined to speak of the sanctity of marriage, it remains "* * * a basic social institution of the highest type and importance, in which society at large has a vital interest." *Holloway* v. *Holloway* (1935), 130 Ohio St. 214, 216. The notion that constraints on marriage, of whatever kind, should be declared void appeared as early as the civil law of Rome and reflected a desire to maintain a young and growing population in order to provide recruits for an expanding military. In England, as well as in this country, the idea of judicial support for marriage was continued as an institution for the preservation of morals. See *Winters* v. *Miller* (1970), 23 Ohio Misc. 73. In modern times, marriage has come to mean more than continued procreation or moral integrity between spouses but has become a foundation for the education of our children in order to secure a productive, competitive, and socially responsible adult population. Our independent review has failed to find any case that has reversed the long standing policy of this state in favor of the preservation of the marriage bonds. Both appellant and appellee's conduct was directly contrary to this well-established public policy and thus, a court of equity should refuse to provide a forum for relief when both parties have willfully acted in derogation of this important public policy. In this instance, the courts do not attempt to decide

which party was the more reprehensible, but simply leaves the parties in the position in which their conduct placed them.

Our result would be unchanged if we were to agree with appellant and conclude that a contract or a conditional gift was the basis for the advancement of the money. Our review has found a multitude of Ohio cases standing for the proposition that a contract in derogation of marriage, or one that encourages divorce, is void as against public policy. *King* v. *King* (1900), 63 Ohio St. 363; *Saslow* v. *Saslow* (1957), 104 Ohio App. 157; *Lyons* v. *Lyons* (1965), 2 Ohio St. 2d 243, overruled on other grounds, *Shearer* v. *Shearer* (1985), 18 Ohio St. 3d 94. *Shearer* represents a recent manifestation of Ohio's policy in favor of promoting marital harmony. As part of its holding abolishing interspousal immunity in negligence actions, the Supreme Court stated:

"We conclude that the preservation of marital harmony is better served by allowing the negligent spouse, who in this day and age has more likely than not purchased liability insurance to compensate those whom he injures, to provide for his injured spouse, than by denying compensation for the spouse's suffering because of fear for the harmony of the marital unit." *Shearer, supra,* at 98.

While it may be a policy as old as ancient Rome, the preservation of marital unity continues to be a persuasive concept in modern jurisprudence. Undoubtedly, it could be argued, with no small degree of force, that appellant owes a moral duty to repay appellee the $5,800 sum. Nevertheless, the existence of a moral duty does not necessarily mean that there exist an enforceable legal duty to perform the same act. However, characterized, there was no duty, enforceable at law or equity, that can be used to obtain payment of the money advanced to appellant to enable him to obtain a divorce to marry appellee. The trial court erred in concluding otherwise.

Appellant's second assignment of error is sustained.

Finally, appellant assigns as error the municipal court's failure to grant his motion for summary judgment. For the reasons previously stated, the court erred in overruling the motion for summary judgment since the deposition of appellee that was filed in support of the motion established the nature of the claim. There was no genuine issue of material fact.

Appellant's first assignment of error is overruled. Appellant's second and third assignments of error are sustained. The judgment of the trial court is reversed and the case is remanded to the trial court to enter final judgment for appellant.

*Judgment reversed and cause remanded.*

YOUNG and GERKEN, JJ., concur.

GERKEN, J., of the Hocking Country Common Pleas Court, sitting by assignment in the Tenth Appellate District.